THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| GENOMIC PREDICTION, INC.,<br><br>      Plaintiffs,<br><br> -against-<br><br>NATHAN TREFF, TALIA METZGAR and NUCLEUS GENOMICS, INC.<br><br>      Defendants. | Case No. 2:25-cv-16850-SDW-AME<br><br>District Judge Susan D. Wigenton,<br><br>Magistrate Judge Andre M. Espinosa<br><br>**Motion Date: November 4, 2025** |

**DECLARATION OF TALIA METZGAR**

I, Talia Metzgar, hereby declare under 28 U.S.C. § 1746 as follows:

1. I am one of the named defendants in the above-captioned action and am the former Head of Medical Affairs for Plaintiff Genomic Prediction, Inc. ("GP"). I have personal knowledge of the following facts and, if called upon as a witness, I would testify competently thereto.

2. I make this declaration in opposition to GP's application for a preliminary injunction with temporary restraining order and limited expedited discovery.

3. Over the course of seventeen years, I worked as a nurse for a variety of fertility clinics, where I gained familiarity and experience counseling patients

-1-

-2-

seeking in vitro fertilization treatment ("IVF") and providing them all information necessary to provide informed consent.

4. Prior to joining GP, I worked at Reproductive Medicine Associates of New Jersey ("RMA") for almost ten years as a clinical research nurse. Like GP, RMA performs preimplantation genetic testing ("PGT") services for fertility clients at its onsite laboratory.

5. In January 2022, I joined GP as its Director of Care Management. Over the next three years, my title changed at various points, the most recent of which was Head of Medical Affairs. Despite title changes, my core responsibilities largely remained the same.

6. At GP, I was responsible for, among other things, drafting and revising clinic and patient-facing documents that would typically be provided to patients at IVF clinics. I was also responsible for communicating with IVF clinics and patients, improving the draft language for patient consent forms, authorization forms, and releases, and establishing other best practices within GP.

7. I understand that Kelly Ketterson (GP's Chief Executive Officer) compiled a list of documents in her declaration that she claims are competitively sensitive and trade secrets. (Ketterson Decl., ¶ 114.) Based on my roles and responsibilities at GP, I am familiar with the form and substance of these documents

as I either drafted, reviewed, or otherwise maintained these documents during the course of my employment at GP.

8. Based on the descriptions provided by Ms. Ketterson's Declaration, with the exception of the form entitled, "PGT Test Run Internal Workflow," the remaining documents listed therein are public, clinic and patient-facing documents that GP readily distributes to, among others, IVF clinics and patients.

9. The document entitled "PGT Test Run Internal Workflow" is simply a standard operating procedure ("SOP") document; that is, it simply sets forth the steps to be performed in a given experiment or process, to ensure uniformity in laboratory procedures and employee safety. Based on my seventeen years of experience in the fertility industry (including ten years at RMA), SOPs such as the one described herein are commonplace and, in fact, required in any PGT laboratory to improve upon efficiencies and consistencies in the workflows.

10. The document entitled "PGT Test Run Protocol and Instructions for Tissue for PGT" is a public set of instructions that is provided to clinics for extracting and handling tissue so that test runs can be conducted prior to performing an actual clinical biopsy on a patient's embryo.

11. The document entitled "PGT Test Run Sample Submission Form" is a public form that is provided to clinics to designate samples as test runs and submit them to GP.

12. The documents entitled "Trophectoderm Biopsy Kit Instructions" and "ORACollect DX Patient Instructions Form Sheet" are public instructions that are provided to clinics on how to successfully extract samples. The "ORACollect DX" instructions are provided to patients as well and are a slightly modified version of the pre-packaged instructions that are included with the commercial ORACollect Dx device.

13. The documents entitled "Preimplantation Genetic Testing Test Requisition Form" and "M2 Haplotype Testing Test Requisition Form" are public forms that are provided to patients and clinics to order specific tests.

14. The documents entitled "Preimplantation Genetic Testing Sample Submission Form" and "Preimplantation Genetic Testing Saliva Sample Submission Form" are public forms that are provided to clinics to submit patient samples.

15. The final nine documents are public consent forms that are provided to clinic patients to provide them with informed consent as to the various forms of PGT testing they are seeking. For example, the document entitled "Informed Consent for Preimplantation Genetic Testing PGT-A: Aneuploidy Screening" explains the condition of Aneuploidy, describes the test, explains what various results might mean, discloses accuracy, explains the limitations of the test, offers recommendations following conception, discloses additional risks, asks for permission to retain samples, provides confidentiality disclaimers, and asks the

patient if they agree to the terms. Much of the language in the consent forms is very similar to, if not verbatim, from the language used by my former employer RMA.

16. In any event, none of the documents identified by Ms. Ketterson contain confidential information, let alone reflect highly technical processes. To the best of my knowledge, not one of these documents was marked with "confidential" or "do not distribute" watermarks, or any other similar designation. Given the common and public use of these forms, I did not and do not consider them to be trade secrets.

17. In early August 2025, I learned that Nathan Treff, PhD, intended to tender his resignation at GP. Dr. Treff and I are in a personal romantic relationship, and were at the time of his resignation, which was known to GP. Given my relationship with Dr. Treff, I was concerned with my job security and the likelihood that Ms. Ketterson would react by terminating my employment in response to Dr. Treff's resignation.

18. As a result, on or about August 11, 2025, I emailed myself a series of documents that I was personally responsible for drafting, editing, or otherwise handling and do not contain trade secrets, which are referenced in Ms. Ketterson's declaration. I forwarded these documents to myself to keep as a point of reference, nothing more. Neither Dr. Treff, Nucleus, nor anyone else instructed me to do this.

19. Although these documents were emailed to my Yahoo.com personal email account, I never read, opened, downloaded, or otherwise reviewed any of

them. I also never printed or otherwise created hard copies of these documents. And, I never shared these documents with Dr. Treff, Nucleus, or any other party. The documents remained in my personal e-mail.

20. On or about August 13, 2025, after Dr. Treff resigned, I was locked out of my work computer. I contacted Ms. Ketterson, who informed me that they would work to restore access, but that we should connect about "my role in the future at GP."

21. On or about August 19, 2025, I was instructed to meet at GP's office and bring both my work and personal phones and laptops, which I did.

22. When I arrived at GP's office, I met with Ms. Ketterson's sister, Kimberly Miller (GP's Solutions Architect and Director of Customer Success). In Ms. Miller's presence, I turned on my work laptop to show Ms. Miller that all GP documents were still on the system and performed the same exercise with my work phone.

23. Ms. Miller then called Jia Xu (GP's Chief Technology Officer) and, with Ms. Xu on the line, I turned on my personal laptop and signed into my Yahoo email address. Although not asked to do so, I offered to go through my Yahoo emails and files to confirm the permanent deletion of these files.

24. In Ms. Miller's presence (and with Ms. Xu on the phone), I opened my Yahoo personal email account and proceeded to delete the emails that I had

previously forwarded to myself, attaching the documents referenced above. I then accessed the "Trash" folder of my Yahoo personal email account and deleted those same emails once more—to ensure their permanent deletion.

25. I then opened my personal laptop and, again, in Ms. Miller's presence (and with Ms. Xu on the phone) opened my "Downloads" folder to confirm that no such files were separately saved on my personal computer.

26. Once I confirmed with Ms. Miller that I no longer was in possession of these files and returned GP's laptop and computer, I was instructed to sign a form that I understand memorialized that I turned in my work devices.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true.

Executed on this 30th day of October, 2025, in Flanders, New Jersey.

_____
Talia Metzgar