<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

GENOMIC PREDICTION, INC.,

                    Plaintiff,

v.

NATHAN TREFF, *et al.*,

                    Defendants.

Civil Action No. 25-16850 (SDW) (AME)

**OPINION**

November 17, 2025

**WIGENTON**, District Judge.

      Before this Court is Plaintiff Genomic Prediction, Inc.'s ("GP") Motion for a Preliminary Injunction with Temporary Restraining Order and Limited Expedited Discovery (D.E. 5) ("Motion"), pursuant to Federal Rule of Civil Procedure ("Rule") 65 and Local Civil Rule ("Local Rule") 65.1, against Defendants Nucleus Genomics, Inc. ("Nucleus"), Dr. Nathan Treff, and Talia Metzgar (collectively, "Defendants"). This opinion is issued without oral argument pursuant to Rule 78 and Local Rule 78.1. For the reasons stated herein, Plaintiff's Motion is **DENIED**.

**I.**    <u>**FACTUAL AND PROCEDURAL HISTORY**</u>

      a.  <u>**Background on Dr. Treff and GP**</u>

      This action arises from Dr. Nathan Treff's departure from GP to Nucleus, and the alleged misappropriation of GP's trade secrets that followed. (*See generally* D.E. 1). GP, a New Jersey company, develops and offers advanced genomic testing products, including tests that help in-vitro

fertilization ("IVF") patients screen embryos for chromosomal abnormalities and complex disease risks. (*Id.* ¶¶ 13, 19.)

Dr. Treff was one of GP's co-founders and served as its Chief Science Officer for almost eight years, managing GP's specimen testing laboratory, also known as a "wet lab". (*Id.* ¶¶ 61, 62; D.E. 13 at 4.) Talia Metzgar, Dr. Treff's partner, was GP's Senior Director and Head of Medical Affairs. (D.E. 1 ¶ 2.) During their employment, both Dr. Treff and Metzgar executed agreements prohibiting the misuse or disclosure of GP's confidential information and trade secrets. (*Id.* ¶¶ 71–80; 88–92.) They each signed a Non-Competition and Confidentiality Agreement ("NCA") restricting them from using GP's confidential information and for Dr. Treff, restricting him from working for a competitor for eighteen months following his employment with GP. (*Id.* ¶¶ 72, 80, 88, 92.)

GP asserts that through his role, Dr. Treff obtained comprehensive knowledge of GP's trade secrets for performing its genomic testing processes—most importantly, it alleges that Dr. Treff accessed and obtained proprietary methods for performing its genomic testing, confidential research and development to adapt a specific Illumina platform to expedite the testing ("Illumina Project"), and confidential pricing, cost, and business information, including its "Controlled Documents," which are confidential workflows and processes relating to their proprietary technology. (D.E. 1-2 ¶¶ 7–37, 41–44; D.E. 1 ¶¶ 27–28, 63.) To this end, GP claims that "it is the only company in the world to process embryo samples in this way." (D.E. 1 ¶ 28.) GP further contends that Dr. Treff retained substantial trade secret research, data, and other confidential materials on his company-issued laptop rather than storing them on GP's shared network. (D.E. 1 ¶¶ 68–69.)

**b. Relationship Between GP and Nucleus and Dr. Treff's Departure from GP**

GP alleges that in June 2025, Nucleus, a software company that generates reports based on genomic data analyzed by wet labs like GP, sought to expand into embryonic DNA testing through a product called "IVF+". (*Id.* ¶ 100.) Nucleus contracted with GP to perform the laboratory work and produce test results for patients. (*Id.* ¶ 102.) Around this time, the companies discussed Nucleus potentially acquiring GP, but reached no agreement.(*Id.* ¶¶ 106, 112.)

On August 12, 2025, Dr. Treff resigned from GP. (*Id.* ¶ 124.) GP alleges that just before his resignation, Dr. Treff permanently deleted trade secrets and confidential information stored exclusively on his company laptop. (*Id.* ¶ 127.) Hours before Dr. Treff's resignation, Metzgar emailed 30 GP documents, including many of GP's confidential "Controlled Documents," from her GP account to her personal one. (*Id.* ¶¶ 114–116.)

Shortly after his resignation, Dr. Treff joined Nucleus as its Chief Clinical Officer. (*Id.* ¶ 139.) GP alleges that on October 6, 2025, its Chief Executive Officer, Kelly Ketterson ("Ketterson"), learned that Dr. Treff, in his new role at Nucleus, was communicating with Kindbody, a third-party provider of genetic testing services, about a potential collaboration involving an Illumina genotyping platform that is "virtually identical" to GP's confidential Illumina Project. (*Id.* ¶ 141; D.E. 5-1 at 7; D.E. 1-2 ¶ 142.) On October 16, 2025, GP learned that Dr. Treff was receiving embryo samples from Kindbody's IVF clinics and working with Sampled, a DNA sequencing company, to generate embryonic DNA sequences for Nucleus, allegedly using the same confidential process GP has developed for its preimplantation genetic testing ("PGT") products. (D.E. 1-2 at ¶¶ 6, 143.) On October 20, 2025, GP states that it discovered "concrete evidence" of Dr. Treff's trade secret misappropriation—Ketterson discovered an email thread containing a Statement of Work ("SOW") between Nucleus and Sampled, which was accidentally sent to Dr. Treff's old GP email address. (D.E. 1-2 ¶ 144.) The SOW discussed Dr. Treff's

"embryo pilot" project, which GP argues demonstrates Sampled's intention to use the same Illumina platform as GP's confidential "Illumina Project." (D.E. 18 at 11; D.E. 1-2 ¶¶ 144–149.) GP asserts that the only way Dr. Treff would know that specific Illumina platform is viable for embryos is based on exhaustive trade secret research that he was involved in at GP. (D.E. 1-2 ¶ 150.) Further, Plaintiff relies on the Nucleus science advisory board agenda attached to an August 19, 2025 email as evidence that Dr. Treff and Nucleus intended to compete with GP by misappropriating its trade secrets, emphasizing that Nucleus did not perform the referenced PGT-A or PGT-M testing, or genotype embryos, before Dr. Treff joined the company. (D.E. 18-5 ¶¶ 11–13.)

Defendants contend that GP has not adequately identified a trade secret, as its references to genomic testing, the Illumina Project, and its business records and practices are too general, making it difficult for the Court to accurately determine Plaintiff's likelihood of success on the misappropriation claim. (D.E. 13 at 17–21.) They also argue that Plaintiff has failed to provide sufficient evidence that any Defendant misused or acquired GP's purported trade secrets, asserting that the allegations are speculative and based on many incorrect assumptions, including about Dr. Treff's employment, the timeline of business developments since Dr. Treff's departure, and the nature of Nucleus's business. (*Id.* at 21–26.)

### c. Procedural History

On October 22, 2025, Plaintiff filed a ten-count complaint against Nucleus, Dr. Treff, and Metzgar, alleging violations of the federal Defend Trade Secrets Act, 18 U.S.C. §§ 1832 *et seq.* ("DTSA"); the New Jersey Trade Secrets Act, N.J. Stat. Ann. §§ 56:15-1 *et seq.* ("NJTSA"); and the New Jersey Computer Related Offenses Act, N.J. Stat. Ann. § 2A:38A-3 ("CROA"). (*See generally* D.E. 1). Two days later, on October 24, 2025, Plaintiff moved for a preliminary

injunction and temporary restraining order against Defendants, pursuant to Rule 65 and Local Rule 65.1, and timely briefing ensued.  (D.E. 5; *see generally* D.E. 13, 18–20.)  On November 4, 2025, this Court held a hearing wherein it reserved decision.  (D.E. 7, 23).  At bottom, Plaintiff asks this Court to (1) enjoin Defendants from using or disclosing GP's trade secrets under the DTSA and NJTSA, as to Dr. Treff and Metzgar, also under their former employment contracts with GP; and (2) prohibit Dr. Treff from continuing to work for Nucleus.  (D.E. 5 at 1.)

## II.    <u>LEGAL STANDARD</u>

The standard for issuing a temporary restraining order and a preliminary injunction is the same.  *See Interior Motives, Inc. v. Salvatore*, No. 20-5178, 2020 WL 2611517, at *2 (D.N.J. May 22, 2020) (quoting *Trefelner ex rel. Trefelner v. Burrell Sch. Dist.*, 655 F. Supp. 2d 581, 589 (W.D. Pa. 2009)).  "A preliminary injunction is an extraordinary remedy that is never to be awarded as of right."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citing *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008)).  When considering whether to grant a preliminary injunction, courts must decide whether the party seeking the injunction has shown:  "(1) a likelihood of success on the merits; (2) he or she will suffer irreparable harm if the injunction is denied; (3) granting relief will not result in even greater harm to the nonmoving party; and (4) the public interest favors such relief."  *Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102, 109 (3d Cir. 2010) (quoting *Miller v. Mitchell*, 598 F.3d 139, 147 (3d Cir. 2010)).  The Third Circuit has placed particular weight on the first two factors, instructing that it "cannot sustain a preliminary injunction ordered by the district court where either or both of these prerequisites are absent."  *Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 197 (3d Cir. 1990) (quoting *In re Arthur Treacher's Franchisee Litig.*, 689 F.2d 1137, 1143 (3d Cir. 1982)); *see also Juul Labs, Inc. v. 4X PODS.*, 439 F. Supp. 3d 341, 350 (D.N.J. 2020) ("A court will consider all four factors, but the first two are essential:  A

court may not grant injunctive relief, 'regardless of what the equities seem to require,' unless plaintiffs carry their burden of establishing both a likelihood of success and irreparable harm." (quoting *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484 (3d Cir. 2000)). If a court finds that the first two factors weigh in favor of the moving party, the "court then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017).

## III.    <u>DISCUSSION</u>

Plaintiff contends that a preliminary injunction is warranted to enjoin Defendants' current and imminent use and disclosure of its trade secrets to unfairly compete with GP. (D.E. 5-1 at 1.) Because Plaintiff has shown neither a likelihood of success on the merits nor irreparable harm, their request for a preliminary injunction must be denied for the reasons set forth herein. *See Ferring Pharms., Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014) ("The 'failure to establish any element . . . renders a preliminary injunction inappropriate.'") (alteration in original) (quoting *NutraSweet Co. v. Vit-Mar Enters., Inc.*, 176 F.3d 151, 153 (3d Cir. 1999)).

### A.  **Likelihood of Success on the Merits**

A party moving for a preliminary injunction bears the burden of proving its likelihood of success on the merits of its case. *Ferring Pharms.*, 765 F.3d at 210. The moving party must "'demonstrate that it *can* win on the merits,' which involves a showing that its chances of establishing each of the elements of the claim are 'significantly better than negligible.'" *Mallet & Co. v. Lacayo*, 16 F.4th 364, 380 (3d Cir. 2021) (quoting *Reilly*, 858 F.3d at 179). Likelihood of success, however, does not require "a more-likely-than-not showing of success." *Reilly*, 858 F.3d

at 179 n.3.  Rather, "a sufficient degree of success for a strong showing exists if there is a 'reasonable chance, or probability, of winning.'" *In re Revel AC, Inc.*, 802 F.3d 558, 568 (3d Cir. 2015) (quoting *Singer Mgmt. Consultants, Inc. v. Milgram*, 650 F.3d 223, 229 (3d Cir. 2011). "[W]hether a party has met this threshold will necessarily vary with the circumstances of each case." *Fres-co Sys. USA, Inc. v. Hawkins*, 690 F. App'x 72, 77 (3d Cir. 2017).  Generally, "preliminary injunction[s] cannot be issued when there are disputed issues of fact." *Gruntal & Co. v. Steinberg*, 843 F. Supp. 1, 16 (D.N.J. 1994) (quoting *Hunterdon Transformer Co. v. Cook*, No. 89-3132, 1990 WL 10342, at *2 (D.N.J. Feb. 6, 1990); *see also Peoplestrategy, Inc. v. Lively Emp. Servs., Inc.*, No. 20-2640, 2020 WL 7869214, at *3 (D.N.J. Aug. 28, 2020) ("A preliminary injunction also should not be issued where material issues of fact are in dispute.") (citing *Vita-Pure, Inc. v. Bhatia*, No. 14-7831, 2015 WL 1496396, at *3 (D.N.J. Apr. 1, 2015); *Collick v. Weeks Marine, Inc.*, 397 F. App'x 762, 764 (3d Cir. 2010) ("In light of . . . the abundance of contradictory facts on both sides of the record, this matter should have proceeded to trial and the entry of a preliminary injunction was inappropriate.").

Here, all of Plaintiff's claims rest on disputed issues of material facts, precluding injunctive relief.  These disputes include, but are not limited to:

- Whether GP and Nucleus are competitors (*i.e.*, whether Nucleus is a "wet lab" offering the same services as GP; developing PGT products that compete with GP's; and whether GP genuinely views Nucleus as a competitor, as none of GP's designated competitors are software companies that provide the same services that Nucleus does), (D.E. 13 at 7, 31; D.E. 18 at 3–4);

- Whether GP's confidential information amounts to a "trade secret," (D.E. 13 at 17–21);

- Whether Dr. Treff or Metzgar retained any of GP's purported trade secret information without authorization after their employment at GP, (*Id.* at 22);

- Whether Dr. Treff or Nucleus had used GP's alleged trade secrets in developing their own products. More particularly, whether Sampled's use of the Illumina genotyping platform originated from GP's confidential "Illumina Project." (*Id.* at 23–24.)

In short, the parties severely dispute the nature of their relationship, the existence and nature of the trade secrets, and the actions of Dr. Treff, Metzgar, and Nucleus immediately preceding and following Dr. Treff's departure from GP. These material factual disputes should be resolved through discovery, not on a motion seeking preliminary injunctive relief.

Moreover, Plaintiff argues that even without direct evidence of the use or disclosure of trade secrets, it has met the burden for a preliminary injunction because Dr. Treff will inevitably use its trade secret information while working for Nucleus. (D.E. 5-1 at 18–19.) *See Sunbelt Rentals, Inc.*, No. 20-17611, 2021 WL 82370, at *25 (D.N.J. Jan. 11, 2021) ("[A]n employer may meet its burden under the DTSA and NJTSA simply by 'demonstrat[ing] that there is a sufficient likelihood of inevitable disclosure of its trade secrets to a competitor.'") (alteration in original) (quoting *Corp. Synergies Grp., LLC v. Andrews*, No. 18-13381, 2019 WL 3780098, at *7 n.10 (D.N.J. Aug. 12, 2019)). However, the inquiry into inevitable disclosure generally presupposes a finding that the employee took the former employer's trade secrets to a competitor. *See id.* at *26 (finding inevitable disclosure when the defendant admitted to copying documents on his desktop, sending them to his personal email address, and joining another company to "compete with Sunbelt [(former employer)] at a national level."); *Corp. Synergies Grp., LLC,* 2019 WL 3780098 at *7

(finding inevitable disclosure when the plaintiff plausibly alleged that its trade secrets were used by the defendants who left for a competitor).

Here, whether Dr. Treff retained any documents without authorization and whether GP and Nucleus are competitors remain disputed issues of fact, precluding a determination that Plaintiff has established a likelihood of success on the merits.  Accordingly, Plaintiff has failed to sustain its burden of establishing a likelihood of success on the merits.

### B.  Irreparable Harm

Even if Plaintiff had adequately demonstrated a likelihood of success on the merits, its claim of irreparable harm has not been established.

The movant "has the burden of proving a 'clear showing of immediate irreparable injury.'" *ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987) (quoting *Continental Grp., Inc. v. Amoco Chems. Corp.*, 614 F.2d 351, 359 (3d Cir. 1980)).  A mere risk of such harm is insufficient. *Id.*  To establish irreparable harm, a "plaintiff must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial.  The preliminary injunction must be the only way of protecting plaintiff from the harm."  *Holland v. Rosen*, 277 F. Supp. 3d 707, 725 (D.N.J. 2017) (quoting *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989)).  On the one hand, "injury measured in solely monetary terms cannot constitute irreparable harm." *Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.*, 562 F.3d 553, 557 (3d Cir. 2009) (citing *Bennington Foods LLC v. St. Croix Renaissance, Grp., LLP*, 528 F.3d 176, 178 (3d Cir. 2008)).  On the other hand, irreparable harm may exist "where a party may be forced to shut down without the requested injunctive relief."  *W. S. Int'l, LLC v. M. Simon Zook, Co.*, 566 F. App'x 192, 197 (3d Cir. 2014) (citing *Instant Air Freight Co.*, 882 F.2d at 802).  Where the movant seeks a

preliminary injunction that "will alter the status quo," it must "meet a higher standard of showing irreparable harm in the absence of an injunction." *Bennington Foods*, 528 F.3d at 179 (citing *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 33–34 (2d Cir. 1995)); *see Tracey v. Recovco Mortg. Mgmt. LLC*, 451 F. Supp. 3d 337, 342 (D.N.J. 2020) ("The standard to obtain preliminary injunctive relief is heavy, particularly where injunctive relief alters the status quo.").

As a threshold matter, Plaintiff requests entry of a preliminary injunction that would alter the status quo—among other things, it asks this Court to prohibit Dr. Treff from working for Nucleus, his current employer.  (D.E. 5-1 at 1.)  Accordingly, Plaintiff must "meet a higher standard of showing irreparable harm in the absence of an injunction." *Bennington Foods*, 528 F.3d at 179.  It has not done so.

Plaintiff has not shown that it would suffer immediate, irreparable harm without the preliminary injunction.  Plaintiff argues that it will and continues to suffer irreparable harm because (1) Dr. Treff and Metzgar's NCA agreements contain clauses stating that breach would cause irreparable harm to GP and (2) Dr. Treff has misappropriated its trade secrets to benefit a competitor, resulting in loss of competitive business advantage and goodwill.  (D.E. 5-1 at 27–28).  Neither argument establishes that any emergent circumstance or harm has arisen from the events underlying this Motion.  First, though Plaintiff argues that trade secret misappropriation "*always causes harm* because the value of the secret is destroyed when it is revealed to unauthorized third parties," determining misappropriation in this case, as explained above, requires adjudicating numerous material issues of fact, such as the existence of protectable trade secrets, whether the parties compete, and whether Nucleus is using the same processes and methods that GP claims are protected trade secrets.  (D.E. 13 at 38–39.)  If the trade secret misappropriation is genuinely at issue, Plaintiff may satisfy the "irreparable harm" inquiry.  However, at this early stage of

litigation, these factual disputes preclude such a finding. *See Watchung Spring Water Co. v. Nestle Waters N. Am. Inc.*, No. 14-4984, 2014 WL 5392065, at *4 (D.N.J. Oct. 23, 2014) (holding that the plaintiff failed to carry its burden under the preliminary injunction inquiry due to "significant, outstanding factual issues…"); *JRM Constr. Mgmt., LLC v. Plescia*, No. 23-932, 2023 WL 2770479, at *8 (D.N.J. Apr. 4, 2023) (holding that plaintiffs failed to establish immediate, irreparable harm because "any determination of irreparable harm requires resolution of numerous material issues of fact."). Second, boilerplate contractual clauses generally cannot establish irreparable harm. *See Ethicon, Inc. v. Randall*, No. 20-13524, 2021 WL 2206106, at *25 (D.N.J. May 28, 2021) ("'A contractual provision simply cannot act as a substitute for a finding by this Court that determines whether a preliminary injunction is proper.'") (quoting *AV Sols., LLC v. Keystone Enter. Servs., LLC*, No. 11-3503, 2011 WL 2971222, at *3 (D.N.J. July 19, 2011)). Accordingly, Plaintiff has failed to satisfy this requirement for injunctive relief.[1]

## IV.    **CONCLUSION**

For the reasons set forth herein, Plaintiff's request for a Preliminary Injunction with Temporary Restraining Order and Limited Expedited Discovery is **DENIED**. An appropriate order follows.

/s/ Susan D. Wigenton
**SUSAN D. WIGENTON, U.S.D.J.**

Orig:   Clerk

---

[1] This Court need not address the remaining factors in light of Plaintiff's failure to establish irreparable harm and a likelihood of success. *See Ferring Pharms.*, 765 F.3d at 210 ("The 'failure to establish any element . . . renders a preliminary injunction inappropriate.'") (quoting *NutraSweet Co.*, 176 F.3d at 153.) Additionally, Plaintiff is not entitled to expedited discovery. *Gucci Am., Inc. v. Daffy's, Inc.*, No. 00-4463, 2000 WL 1720738, at *5–6 (D.N.J. Nov. 14, 2000) "… [A] party seeking expedited discovery must demonstrate (1) irreparable injury, (2) some probability of success on the merits, (3) some connection between the expedited discovery and the avoidance of the irreparable injury, and (4) some evidence that the injury that will result without expedited discovery looms greater than the injury that the defendant will suffer if the expedited relief is granted.").

cc:    Parties
       André M. Espinosa, U.S.M.J.